118

1    A.    I know that Mr. Vanderburg has mentioned

2    that there were serious misrepresentations as to the

3    company, the computer system, the financial condition of

4    the company, that wasn't represented as such in the due

5    diligence material.  I don't have that personal

6    knowledge.

7        Q.    Okay.  I've not seen any documents produced

8    by any of the Defendants that relates to anything that

9    you've just said.  So are there documents that reflect

10   these representations?

11       A.    Not that I have in my possession.

12       Q.    Well, are there documents, though?  I

13   understand they're -- they may not be in your

14   possession, but are there documents out there that

15   you've seen or are aware of that would support Mr.

16   Vanderburg's claim that there were misrepresentations

17   made?

18       A.    I don't know unless there were e-mails sent

19   or conversations had.  I don't.  I don't have any

20   documents or recall any documents.

21       Q.    You've not seen any?

22       A.    Not sitting here, going back to December

23   2001, I can't recall any.

24       Q.    Are you familiar with anyone else telling

25   you that Mr. Stentz did something wrongful or

**EXHIBIT A**
EXCERPT FROM DEPOSITION
OF JAMES BAIERS

30

1    we've got Craig A. Vanderburg, individually as guarantor

2    of Presidion.  Is that your signature?

3        A    I believe it is.

4        Q    Why was this Release and Settlement Agreement

5    entered into as reflected in Exhibit 13?

6        A    I'll have to read the entire document to be

7    able to respond to that.  Do you want to take the time to

8    do that?

9        Q    Well, if you would take whatever time you think

10   you need just to refresh your recollection as to why you

11   entered into this agreement.

12           MR. JUDGE:  Take your time.

13       Q    And if you would, just let me know when you

14   feel like you've read enough to provide whatever

15   background is needed to assist you with refreshing your

16   recollection.

17       A    Okay.  I think I have an idea of what we were

18   looking to accomplish in this document.

19       Q    Do you remember there being various

20   disagreements among the parties that led up to the

21   execution of this Release and Settlement Agreement?

22       A    Various agreements?

23       Q    Disagreements.

24       A    Oh, disagreements.  I believe there was

25   disagreements on material components of the business that

31

1   reflected our position on the transaction with Amfinity.

2        Q     What components of the business are you

3   referring to?

4        A     We were of the position that there were

5   substantial material differences in what was represented

6   in the sale of the book -- of the company and its book of

7   business to where, ultimately, we believe the book was at

8   once we had control over it.

9        Q     Okay.  If there were errors concerning the

10  scope of the book of business?

11       A     Correct.

12       Q     And were there other disputes at that time or

13  disagreements, contingents, that resulted in the

14  execution of this Release and Settlement Agreement?

15       A     There was -- based on the agreement, there was

16  clearly some disputes associated with liabilities of the

17  company because the agreement called for us to have an

18  offset of a million dollars from the purchase price.  So

19  there was clearly disputes over liability.

20       Q     And when the Stock Purchase Agreement was

21  entered into in January of 2002, you perceived that there

22  may be these disputes, did you not?

23       A     The agreement anticipates some disputes.

24       Q     And is that because of the complexity of the

25  nature of PEO transactions?

32

1      A      Well, I think that's just general practice in

2  any transaction, but it certainly can be compounded by

3  the complexity of a PEO transaction.

4      Q      And the anticipation concerning disputes was

5  such that the parties agreed that there could be an

6  adjustment up to $1 million in favor of the Affinity

7  purchasers?

8      A      That was part of the agreement, yes.

9      Q      And this Release and Settlement Agreement, did

10  it make an adjustment to the extent that the Affinity

11  purchasers were credited for the maximum net worth

12  adjustment of $1 million?

13      A      The agreement calls for that, yes.

14      Q      And that's in paragraph 1 of Exhibit 13

15  entitled "Consideration"?

16      A      Yes.

17      Q      Now, in exchange for that 1-million-dollar

18  max-out on the net worth adjustment, did the Presidion

19  parties also agree to provide releases to the Amfinity

20  parties?  And I direct your attention to paragraph 4(a).

21      A      It appears that way, yes.

22      Q      Now, did you review the various documents that

23  you executed in January of 2000, the Stock Purchase

24  Agreement and the exhibits to the Stock Purchase

25  Agreement?

56

1    Services after the sales transaction occurred?

2        A    There was no shift to Affinity Business after

3    the sale occurred.  I don't know why you said that.

4    Paradyme continued to operate as an operating company, I

5    believe.

6        Q    Okay.  Well, thanks for the clarification,

7    then.

8             With respect to Paradyme, did those customers

9    decline to continue --

10       A    I don't know the specifics.

11       Q    -- to be Paradyme customers or were they never

12   Paradyme customers?

13       A    I would imagine that in cases where there was

14   less volume than we anticipated, it was primarily due to

15   customers that were customers of Paradyme that elected to

16   not continue to be customers of Paradyme.

17       Q    Are there any other numbers that you believe

18   were misrepresented?

19       A    Well, the numbers represented by the value of

20   the software system we were acquiring, because it wasn't

21   fully integrated, it to this day was never fully

22   integrated.  It never worked and we were told that it

23   does and did and --

24       Q    Okay.  We covered that; right?

25       A    Well --

EXCERPT FROM DEPOSITION
OF JOHN BURCHAM

57

```
 1      Q    -- the software.

 2      A    -- I'm still upset about it because it cost me

 3  everything.

 4      Q    Let's talk for a moment about these numbers of

 5  employees and clients that you say were misrepresented.

 6  Were there ever any complaints or claims made by you to

 7  the Hendricks group about this purported

 8  misrepresentation?

 9      A    Again, I was not an operating person in this

10  business.  I was the Chairman of the Board and I don't

11  know that we even had any board meetings.  I can recall

12  one or two.  And as far as the day-to-day operations and

13  the negotiations and discussions post this acquisition

14  were all handled between Mr. Baiers, Mr. Vanderburg, and

15  the Hendricks people.

16      Q    Well, I'm not sure --

17      A    After the closing, I didn't have any

18  discussions with Hendricks whatsoever.

19      Q    So you, Mr. Burcham, did not make claims or

20  complaints against the Hendricks group concerning the

21  number of customers or employees that were supposed to be

22  a part of this transaction, you yourself did not?

23      A    I was not in a position to have done that, and

24  I didn't learn it until much after the fact.

25      Q    And you didn't do it?
```